OPINION OF THE COURT
Richter, J.
In this legal malpractice action, plaintiffs allege that defendant law firm failed to provide them with the appropriate legal advice, and rendered a legal opinion without performing the necessary due diligence, in connection with the securitization of a pool of commercial mortgage loans. When one of the loans went into default, the trustee of the trust holding the mortgages brought an action against plaintiffs in federal court alleging that they had breached various warranties in the securitization agreements. Plaintiffs maintain that the alleged breach of the warranties was the result of the law firm’s malpractice leading up to and during the securitization process. Plaintiffs claim that they were forced to settle the federal lawsuit for millions of dollars, and that they would not have suffered these damages but for the law firm’s negligence. The motion court denied the law firm’s motion for summary judgment dismissing the malpractice cause of action (35 Misc 3d 1222[A], 2012 NY Slip Op 50815[U] [2012]). We now modify to dismiss that part of plaintiffs’ claim alleging that the law firm failed to provide appropriate legal advice, and to limit plaintiffs’ claim that the law firm did not perform the requisite due diligence before rendering its legal opinion on the securitization.
In the mid-1990s, plaintiff Nomura Asset Capital Corporation (Nomura) was an industry leader in originating and securitizing commercial mortgage loans. Securitization is a process whereby a group of commercial mortgage loans are pooled together, sold to a special purpose entity, and transferred to a trust. Fractional interests in the pool of mortgages are then sold to investors in the form of securities, known as commercial mortgage backed securities (CMBS). As the mortgage loans are paid back, the investors receive their share of the principal and interest payments received from the borrowers.
*233 Nomura typically securitized its commercial mortgage loans through REMIC trusts,[1] which enjoy certain federal income tax benefits (see 26 USC § 860D). In order to qualify as a REMIC trust, the pool of mortgages must satisfy a set of stringent tests. The Internal Revenue Code requires that substantially all of the assets in a REMIC trust be “qualified mortgages and permitted investments” (26 USC § 860D [a] [4]). A “qualified mortgage,” as relevant here, must be “principally secured by an interest in real property” (26 USC § 860G [a] [3] [A]). Treasury regulations provide that one way of meeting the “principally secured” requirement is if the “fair market value of the interest in real property securing” the mortgage loan is “at least equal to 80 percent of the adjusted issue price” of the loan, either on the date the loan is originated or at the time the REMIC sponsor contributes it to the trust (26 CFR 1.860G-2 [a] [1] [i] [A], [B]).
Thus, to satisfy REMIC requirements, the fair market value of the real property must be at least 80% of the amount of the loan (the 80% test). For example, if the mortgage loan is $100,000, the real property securing the loan must be worth at least $80,000. The 80% test is expressed as an 80% value-to-loan ratio (VTL). Mortgage lenders typically use a loan-to-value ratio (LTV) in assessing whether to make a loan. An 80% VTL is equivalent to a 125% LTV Thus, to meet the 80% test for REMIC purposes, the LTV must be 125% or less.
REMIC real property has a specific definition under the regulations, and consists of “land or improvements thereon, such as buildings or other inherently permanent structures thereon” (26 CFR 1.856-3 [d]). The term includes “structural components of such buildings,” such as wiring, plumbing, and central heating and air-conditioning machinery, but excludes items that are “accessory to the operation of a business,” like machinery, office equipment, refrigerators, and furnishings (id.).
Nomura retained defendant Cadwalader, Wickersham & Taft LLP (Cadwalader), a leading law firm in the securitization field, to advise Nomura on the legal and tax aspects of its CMBS program. In addition to providing advice, Cadwalader acted as securitization counsel for many of Nomura’s securitizations, drafted the relevant documents, and rendered legal opinions. Among the Cadwalader lawyers advising Nomura and working *234 on the securitizations were Anna Glick, a corporate partner, Charles Adelman, a tax partner, and Lisa Post-Gershon.
This litigation involves Nomura’s Series 1997-D5 Securitization (the D5 Securitization), which consisted of a pool of 156 mortgage loans worth approximately $1.8 billion in the aggregate. Cadwalader drafted the securitization documents, including the Pooling and Servicing Agreement (PSA) and Mortgage Loan Purchase and Sale Agreement (MLPSA). The transaction closed on October 24, 1997 when, pursuant to those agreements, Nomura sold the loans to its subsidiary, plaintiff Asset Securitization Corporation (ASC) (collectively Nomura). ASC then transferred the mortgages into a trust (the D5 Trust), and securities representing interests in the trust were sold to investors. LaSalle Bank National Association (LaSalle) acted as the trustee.
The PSA and MLPSA contain various representations and warranties made for the benefit of the investors, two of which are relevant here. In the Qualified Mortgage Warranty, Nomura represented that each of the loans in the trust was a “qualified mortgage” for REMIC purposes. As noted earlier, a mortgage qualifies as REMIC-eligible if it satisfies the 80% test, i.e., if the loan is 80% secured by real property. In a separate warranty, the 80% Warranty, Nomura similarly represented that the real property securing each mortgage loan, as evidenced by a recent appraisal, had a fair market value of at least 80% of the principal amount of the loan at the time the mortgage was originated or included in the trust.
One of the largest mortgages in the D5 Securitization was a $50,000,000 loan made on August 28, 1997, and secured by Doctors Hospital of Hyde Park, an acute care facility in Chicago (the Doctors Hospital Loan). Prior to the loan’s closing, Nomura hired an appraiser who valued the hospital at $68,000,000, using the income capitalization approach, which focuses on the income the asset will likely generate, and considers both tangible and intangible assets of a going concern, i.e., an operating business. The appraiser’s $68,000,000 figure was allocated as follows: land valued at $3,000,000, building and improvements valued at $27,960,000, equipment valued at $9,640,000, and intangibles valued at $27,400,000. The appraiser also used the cost approach, which assesses the value of the land as vacant along with the depreciated replacement costs of the improvements and equipment. Under that methodology, the property was valued at $40,600,000 (comprised of the value of the land, *235 building and improvements, and equipment, but not the intangibles).
The appraiser did not conduct a detailed inventory of the hospital’s equipment, but based the equipment value on a typical figure for similar acute care hospitals. Because REMIC real property includes some, but not all, equipment, one cannot ascertain from the appraisal whether any of the $9,640,000 equipment value constitutes real property for REMIC purposes. Based on the face of the appraisal, the only certain REMIC real property is the land, building and improvements, which total $30,960,000. The loan here was $50,000,000, so to be REMICeligible it needed to be secured by 80% REMIC real property, or $40,000,000. Since the $30,960,000 figure is less than $40,000,000, it would not satisfy the REMIC 80% test. Even if one were to view all of the equipment as being REMIC-eligible, the resulting value, $40,600,000, would come perilously close to not being REMIC-eligible.
On October 24, 1997, the closing date for the D5 Securitization, Cadwalader, acting as securitization counsel, rendered an opinion stating, inter alia, that the D5 Trust was eligible for treatment as a REMIC trust for federal income tax purposes (the Opinion Letter). On that same date, Cadwalader also sent a letter to LaSalle and various rating agencies confirming that those entities could rely on its opinion that the trust was REMIC-qualified. In the Opinion Letter, Cadwalader identifies the categories of documents it relied upon in rendering its opinion, including the PSA, the MLPSA, and the various prospectuses. The Opinion Letter also states that as to any material facts not known to Cadwalader, it relied upon statements and representations made by Nomura. It is undisputed that Cadwalader did not review the appraisal for the Doctors Hospital Loan before rendering its opinion.
In the spring of 2000, Doctors Hospital filed for bankruptcy, and the loan defaulted. On June 1, 2000, the Special Servicer of the securitization gave Nomura written notice that the Doctors Hospital Loan was not REMIC-qualified because it failed the 80% test, and demanded that Nomura repurchase the loan. The Special Servicer noted that the appraisal valued the real property at only $30,960,000, which was substantially less than the requisite $40,000,000.
When Nomura refused to repurchase the loan, LaSalle brought suit in federal court alleging that Nomura had breached the Qualified Mortgage Warranty and the 80% Warranty. The *236 District Court granted summary judgment to Nomura and dismissed the action (LaSalle Bank N.A. v Nomura Asset Capital Corp., 2004 WL 2072501, 2004 US Dist LEXIS 18599 [SD NY 2004]). On appeal, the Second Circuit modified, stating, inter alia, that issues of fact exist as to whether the Doctors Hospital Loan was secured by at least 80% REMIC real property (424 F3d 195, 208 [2d Cir 2005]). In July 2006, before trial, Nomura settled the federal action for $67.5 million, and repurchased the loan.
Nomura commenced this action asserting that Cadwalader committed legal malpractice, which caused Nomura to settle the federal lawsuit. In the complaint, Nomura alleges that (i) Cadwalader failed to adequately advise Nomura about the applicable REMIC regulations (the advice claim); and (ii) Cadwalader failed to perform the necessary due diligence before issuing its Opinion Letter stating the trust was REMIC-qualified (the due diligence claim).[2] The motion court denied Cadwalader’s motion for summary judgment, finding issues of fact as to whether the law firm’s advice was deficient, whether the Opinion Letter was issued without sufficient due diligence, and whether Cadwalader’s representation of Nomura in the D5 Securitization proximately caused Nomura damages (35 Misc 3d 1222[A], 2012 NY Slip Op 50815[U] [2012]). Cadwalader appeals, and we now modify to dismiss the advice claim and to limit the due diligence claim. Although we do not accept all of Nomura’s arguments, we deny summary judgment on the due diligence claim, finding an issue of fact raised by a critical document focused on by the trial court.
To sustain a cause of action for legal malpractice, a plaintiff must show “(1) that the attorney was negligent; (2) that such negligence was a proximate cause of [the] plaintiffs losses; and (3) proof of actual damages” (Brooks v Lewin, 21 AD3d 731, 734 [1st Dept 2005], lv denied 6 NY3d 713 [2006]). To show negligence, the plaintiff must establish “that the attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession” (Dombrowski v Bulson, 19 NY3d 347, 350 [2012] [internal quotation marks omitted]). To establish proximate cause, the plaintiff is required to demonstrate that “but for” the attorney’s negligence, it “would have prevailed in the underlying matter or *237 would not have sustained any ascertainable damages” (Brooks v Lewin, 21 AD3d at 734).
In the advice claim, Nomura alleges that Cadwalader did not advise it of a basic REMIC principle — that the appraisals of the collateral securing the mortgage loans had to separately value the real property, as that term is defined by the REMIC regulations. In its motion for summary judgment, Cadwalader submitted testimony of Charles Adelman and Anna Glick, two of the attorneys who worked on the D5 Securitization. Adelman testified that he advised Nomura that (i) loans in a REMIC-eligible trust must be secured by real property with a value of at least 80% of the loan amount; (ii) real property for REMIC purposes includes land, buildings and permanent structures; (iii) only real property can be considered, and personal property does not count; and (iv) the REMIC 80% test is best proved by an independent third-party appraisal that should separately measure the real property components of the asset.[3] In that regard, Nomura was instructed that an appraisal of REMIC real property should exclude the going-concern value of an operating business. It is undisputed that this is a correct statement of the REMIC rules.
Glick testified that she and Adelman had numerous discussions with Nomura’s securitization team about REMIC requirements. She submitted an affidavit stating that before the D5 Securitization closed, Cadwalader provided Nomura with “detailed advice” as to how to satisfy the 80% test. As part of that advice, Glick told Nomura to add together the value of what was plainly REMIC real property, such as land and structural improvements. If that sum amounted to at least 80% of the loan amount, the 80% test would be met. If not, Glick advised Nomura that it should make further inquiries to determine whether the loan met the 80% test. Adelman also advised Nomura that it should consult with Cadwalader if it had any questions about a particular loan.
Perry Gershon, a former vice-president of Nomura who was in charge of the D5 Securitization, confirmed that Cadwalader properly advised Nomura of the REMIC rules. He testified that prior to the D5 Securitization, Cadwalader told him, and he *238 understood, that a REMIC loan needed to be secured by real property worth at least 80% of the loan, that real property includes land and buildings, but not personal property, and that the appraisals of the collateral securing the mortgage loans in the trust had to separately value the real property.
The testimony of Adelman, Glick and Gershon satisfied Cadwalader’s prima facie burden on summary judgment showing that the allegedly missing advice was in fact given to Nomura (see Stolmeier v Fields, 280 AD2d 342, 343 [1st Dept 2001], lv denied 96 NY2d 714 [2001] [rejecting failure to advise claim where the client’s own deposition testimony showed he was aware of the advice]). Contrary to the motion court’s conclusion, we find nothing inconsistent in Gershon’s testimony. Gershon’s alleged inability to succinctly articulate the REMIC rules during his deposition, which took place more than 10 years after the advice was given, does not refute his unrebutted testimony that Cadwalader advised him of the relevant rules at the time of the D5 Securitization. Nor does the fact that Gershon is married to one of the Cadwalader attorneys who worked on the transaction, standing alone, raise an issue of fact. At his deposition, Gershon made clear that his wife’s employment at Cadwalader had no bearing on how he viewed the litigation. Nomura’s current argument to the contrary would only be based on speculation. In any event, even if we were to discount Gershon’s statements, the unchallenged testimony of Adelman and Glick shows that the proper REMIC advice was given.
Because Cadwalader met its prima facie burden on summary judgment, the burden shifted to Nomura “to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action” (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]). Nomura failed to satisfy that burden. It points to no documentary evidence directly refuting the testimony of Adelman, Glick and Gershon that the proper REMIC advice was given. Nor did any witness testify that Cadwalader specifically failed to advise Nomura that the appraisals for the D5 Securitization had to separately value the real property components of the asset in question.
Nomura relies on isolated sections of deposition testimony from some employees suggesting that they may not have been fully familiar with the REMIC rules. For example, Christopher Tokarski, a member of Nomura’s securitization team, testified that he was unaware of the 80% test. He claimed to not know *239 much about appraisals, or that appraisals could include a real property and a personal property component. Nomura points to no evidence, however, that Tokarski’s alleged lack of understanding was attributable to anything Cadwalader said to Nomura.
Similarly, Barry Funt, Nomura’s former general counsel, appears to have mistakenly believed that the REMIC regulations would always be satisfied if Nomura originated loans in accord with its own underwriting guidelines.[4] But Nomura does not contend on appeal that it requested Cadwalader to review or provide advice about its underwriting guidelines. Moreover, Funt testified that Anna Glick gave him a primer on REMIC rules, and does not challenge her testimony that she advised Nomura properly. Merely because a Nomura employee may have failed to understand certain REMIC principles, does not, absent more, raise an issue of fact as to whether the advice was given in the first place. Funt’s testimony, and that of the other Nomura employees, is insufficient to rebut Cadwalader’s detailed showing that it advised Nomura of the REMIC rules. Thus, the motion court should have granted summary judgment dismissing the advice claim.
Nomura also alleges that Cadwalader committed malpractice by failing to conduct the necessary due diligence before rendering its opinion that the D5 Trust was REMIC-qualified. In particular, Nomura contends that Cadwalader should have reviewed the underlying appraisals for all of the properties included in the D5 Securitization, and independently confirmed that they were based on real property values that satisfied REMIC requirements. According to Nomura, a review of the appraisal for the Doctors Hospital Loan would have shown a real property valuation of only $30,960,000, approximately $10 million less than the $40 million needed to be REMIC-qualified.
Cadwalader maintains that it was not required to review all of the appraisals, and was instead entitled to rely on Nomura’s representations in the securitization documents that the 80% test was satisfied. Perry Gershon testified that the scope of Cadwalader’s duties did not include review of the appraisals, and that the REMIC opinion was to be based on information *240 provided to Cadwalader by Nomura. Gershon explained that Nomura did not ask or expect Cadwalader to review the appraisals, and he specifically told Cadwalader not to independently verify the accuracy of Nomura’s representations unless specifically requested. Barry Funt confirmed that understanding, testifying that he never directed Cadwalader to review the appraisals, and did not expect Cadwalader to look at every one of them. Moreover, in light of Nomura’s sophistication in the securitization field, and its knowledge of the REMIC rules, Cadwalader cannot be faulted for not undertaking a de novo review of all of the appraisals to determine REMIC-eligibility.
Cadwalader also submitted affidavits from experts in the CMBS and REMIC fields opining that Cadwalader followed the accepted practice of CMBS attorneys in relying on Nomura’s representations and not reviewing all of the appraisals. For example, Michael Weinberger, a partner at Cleary Gottlieb Steen & Hamilton LLP who practices in the CMBS field, stated that customarily it is the role of the client, not securitization counsel, to examine the appraisals of the collateral securing the loans. James M. Peaslee, a REMIC expert at Cleary Gottlieb, agreed, stating that it is not standard practice for securitization counsel to look at appraisals absent a specific request from the client. Based on these opinions, along with the fact that Nomura specifically requested Cadwalader not to review the appraisals, we conclude that Cadwalader had no generalized duty to review the underlying appraisals for all of the loans in the securitization.
The opinion rendered by Nomura’s expert, Arthur Norman Field, does not raise an issue of fact as to whether Cadwalader should have reviewed all of the appraisals. Field opines on the general practice of rendering closing opinions, but has no expertise in REMIC issues. He has never practiced in the securitization or REMIC fields, has never advised a client on REMIC matters, and has never studied the standards governing tax attorneys with respect to REMIC opinions. Nor does Field sufficiently address one of the most critical facts here — that Nomura specifically instructed Cadwalader to not review the appraisals.
Although we reject Nomura’s due diligence claim to the extent it asserts that Cadwalader had a generalized duty to review all of the appraisals, that does not end the inquiry. Adelman testified that reviewing an appraisal would be appropriate if Cadwalader received any information that would have caused it to *241 question whether the loan satisfied the 80% test. James M. Peaslee, one of Cadwalader’s experts, agreed, stating that securitization counsel should not simply rely on a client’s representations if it saw something inconsistent with them. Even the dissent concedes that if Cadwalader received information that would call into question the REMIC-eligibility of one of the loans, it had the duty to make further inquiry and raise the issue with Nomura. Thus, both Cadwalader and the dissent acknowledge that if “red flags” are raised about a client’s representations, further inquiry would be warranted.
We cannot conclude as a matter of law that no such “red flags” were raised. On September 30, 1997, several weeks before Cadwalader issued its Opinion Letter, Nomura faxed Cadwalader a document describing the “Deal Highlights” of the Doctors Hospital Loan. The fax cover sheet indicates that the document was sent directly to Lisa Post-Gershon, one of the Cadwalader attorneys working on the transaction. The fax headers show that only a single 39-page document was transmitted. Thus, the document was sent alone, and was not part of some larger document production.
Viewing the evidence in the light most favorable to Nomura, we find that a jury could reasonably conclude that the “Deal Highlights” document, on its face, contains warning signs that the Doctors Hospital Loan may not have qualified for REMIC treatment. Although one section of the document shows an appraised value of $68,000,000, which, at first glance, suggests that the loan would be REMIC-eligible, the totality of the other information contained therein raises questions as to whether the $68,000,000 figure constituted only REMIC real property.
On the very first page, the document describes the loan as being “secured by the land, building, and operations of the property known as Doctor’s Hospital” (emphasis added). It also identifies the collateral as “[t]he land, building and property management (operations)” of the hospital (emphasis added). According to the advice given to Nomura by Cadwalader, real property for REMIC purposes includes land, buildings and permanent structures. Critically, Cadwalader also advised Nomura that, for REMIC purposes, it should exclude the going-concern value of an operating business. Thus, the fact that the loan was secured by “operations” could reasonably be viewed as an indication that Nomura had obtained an appraisal that included non-REMIC-qualified property. At the very least, the document made clear that Nomura’s valuation figure was based on items other than land, buildings and structures.
*242 That the $68,000,000 figure might include a substantial amount of non-REMIC-eligible property becomes clearer in subsequent pages of the “Deal Highlights” document. The section titled “Appraised Value” sets forth a $40,600,000 alternate valuation based on the cost approach, which focuses not on operations, but on the land, buildings and improvements, and equipment. As noted by the motion court, this amount is dangerously close to the $40,000,000 needed for REMIC eligibility, and thus raises questions as to whether the loan should have been included in the securitization.
Indeed, Adelman conceded that he would typically inquire further if a valuation came close to REMIC-eligibility, and that his practice was to request the underlying appraisal if he believed further inquiry was required. It is undisputed that Cadwalader made no further inquiry and did not request the appraisal. The dissent ignores Adelman’s testimony on this point, and provides no persuasive reason to support its conclusion that the $40,600,000 appraisal figure does not constitute a “red flag” as a matter of law. Instead, the dissent points to the alternate $68,000,000 valuation contained in the document to argue that no warning signs were present. But the dissent cannot escape the fact that the Deal Highlights document also contains the $40,600,000 figure, a potential “red flag” apparent from the face of the document itself.
The dissent argues that no unusual scrutiny needed to be given to the Doctors Hospital Loan because other loans in the securitization were also income-producing going-concern businesses.[5] But a potential “red flag” exists not solely based on the going-concern status of the Doctors Hospital but because the Deal Highlights document indicates that the loan was secured, in part, by “operations,” suggesting that some of the loan collateral was not REMIC-qualified. In any event, that the Doctors Hospital was partially secured by “operations” is not the only *243 basis for our conclusion that further inquiry into the loan may have been warranted. Moreover, the dissent’s focus on other loans in the securitization misses the mark. The question here is not, as the dissent frames it, whether the Doctors Hospital Loan was different from the other loans. Rather, the proper inquiry is whether Cadwalader has met its burden of establishing, as a matter of law, that the Deal Highlights document contained no “red flags” to suggest that the loan was not REMICqualified. We find that Cadwalader has not satisfied its burden.
Relying on testimony from Anna Glick, the dissent excuses Cadwalader’s inaction by suggesting that Nomura, which had in its possession the underlying appraisal, should itself have raised any potential REMIC issues with Cadwalader. The dissent’s conclusion that Cadwalader should be allowed to escape liability due to “Nomura’s own oversight” is inconsistent with the dissent’s acknowledgment that Cadwalader could not ignore warning signs in the Deal Highlights document if it saw any. It also ignores the testimony of Cadwalader’s lead partner Charles Adelman, and its expert James M. Peaslee, that a lawyer cannot blindly rely on a client’s representations if the lawyer sees something inconsistent with them. By shifting the blame here to Nomura alone, the dissent, in effect, is proposing that a law firm that has a knowledgeable client should, as a matter of law, be excused from its document review obligations.
The dissent’s recitation of Adelman’s testimony is misleading. Although Adelman testified that no “red flag” was presented with respect to the Doctors Hospital Loan, he was not talking about the “Deal Highlights” document. In fact, Cadwalader points to no evidence that Adelman, or anyone at Cadwalader, even read the document. Despite having been given the opportunity by the motion court to specifically address the document, Cadwalader failed to submit an affidavit from Adelman, or any of Cadwalader’s lawyers. Thus, it is unknown whether Cadwalader read the document and overlooked the potential “red flags,” interpreted all of the information therein to be consistent with the REMIC rules, or merely filed it away. Nor did Cadwalader, in its submissions to the motion court, address the fact that the document referenced the $40,600,000 cost-approach valuation that came dangerously close to the REMIC threshold.
If Cadwalader did not fully analyze the “Deal Highlights” document, there may be a reason for this decision. But the record before us sheds little light on the central question of what *244 happened after the document was faxed to Cadwalader. In light of Cadwalader’s role as securitization counsel, a jury might reasonably conclude that Cadwalader should have read a document separately sent by its client relating to one of the largest loans in the securitization, and then made a follow-up inquiry about the Doctors Hospital Loan.
Having no convincing response to the significance of the “Deal Highlights” document, the dissent resorts to chastising the majority for addressing the document at all. In the dissent’s view, because Nomura’s appellate brief did not discuss the document at length, we should essentially ignore it.[6] The dissent overlooks the fact that, although not the primary focus of Nomura’s brief, the “Deal Highlights” document was critical to the motion court’s conclusion that issues of fact exist as to whether Cadwalader ignored “red flags.” It is the role of this Court to address not only arguments made in appellate briefs, but also to review the conclusions and reasoning of the lower courts.
It is not surprising that Nomura did not rely solely on this document, because its main appellate argument, which we reject, was that Cadwalader had a duty to review all of the underlying appraisals, regardless of any “red flags.” Although Nomura hoped to prevail on a broader theory, which could have made it much easier for them to prevail at trial, we uphold the due diligence claim on a more limited basis. The dissent fails to recognize that the majority is doing what courts routinely do on summary judgment motions — narrowing the issues for trial. The dissent apparently believes that because the majority rejects Nomura’s claim that Cadwalader had a generalized duty to review all of the appraisals, we should ignore altogether the portion of the motion court’s decision that addressed the “Deal Highlights” document. Ultimately, it is for the trier of fact, not this Court, to decide whether Cadwalader met its duty of care upon receipt of the document, taking into account the potential problems it showed and the overall expertise of the client.
Cadwalader’s reliance on the Opinion Letter to escape all liability is unavailing. The letter states that Cadwalader was relying on Nomura’s representations as to “facts material to [the opinion that] were not known to [Cadwalader].” It further *245 makes clear that Cadwalader’s “knowledge” means “actual awareness . . . of . . . information by any lawyer in our firm actively involved in the [D5 Securitization].” Since there are questions of fact as to the circumstances under which Cadwalader received the “Deal Highlights” document, and what Cadwalader knew about the Doctors Hospital valuation, it cannot be said as a matter of law that the disclaimers in the Opinion Letter insulate Cadwalader from the malpractice alleged.[7]
Finally, Cadwalader argues that Nomura cannot establish proximate cause because the Doctors Hospital Loan was in fact REMIC-qualified. Cadwalader contends that the loan was secured by the requisite 80% REMIC real property, and that Nomura made formal judicial admissions of that alleged fact in the federal action. These contentions lack merit. In the appraisal obtained before the securitization closed, the only readily apparent REMIC real property amounts to only $30,960,000, which is plainly less than the required $40,000,000. Although a subsequent appraisal obtained after the deal closed indicates that the loan was REMIC-qualified, that merely presents a question of fact for a jury.
There is no merit to Cadwalader’s contention that Nomura made formal judicial admissions that the loan qualified for REMIC treatment. Cadwalader points to only two alleged admissions made in the federal action. First, during an oral argument, Nomura’s counsel stated that the appraisal evidences that the loan was secured by sufficient REMIC real property. Second, a point heading in one of Nomura’s memoranda of law states that the fair market value of the interest in real property with respect to the Doctors Hospital Loan was at least 80% of the amount of the loan. These statements constitute, at most, informal judicial admissions that provide some evidence of the facts admitted, but that are not conclusively binding on Nomura (see Baje Realty Corp. v Cutler, 32 AD3d 307, 310 [1st Dept 2006]). They lack the formality required to constitute formal judicial admissions (see GJF Constr., Inc. v Sirius Am. Ins. Co., 89 AD3d 622, 626 [1st Dept 2011, Richter, J., concur *246 ring]). We have considered Cadwalader’s remaining arguments on causation and find them unavailing.
In concluding that the malpractice cause of action against Cadwalader should be dismissed in its entirety, the dissent misperceives that the majority is reaching out to create an issue of fact. We emphatically reject this contention, and it does not become true simply because the dissent continually repeats it. As noted, the motion court, in its decision, addressed the significance of the Deal Highlights document in denying Cadwalader’s motion for summary judgment. In light of the motion court’s reliance upon this critical document, it is disingenuous for the dissent to accuse the majority of creating fact issues for trial. In upholding Nomura’s malpractice claim on a narrow basis, we fully adhere to our role of “issue-finding, rather than issue-determination” (Vega v Restani Constr. Corp., 18 NY3d 499, 505 [2012] [internal quotation marks omitted]).
Accordingly, the order of the Supreme Court, New York County (Melvin L. Schweitzer, J.), entered on or about January 13, 2012, which denied defendant’s motion for summary judgment dismissing the first cause of action, should be modified, on the law, to grant the motion with respect to that part of the cause of action alleging that defendant failed to properly advise plaintiffs, and otherwise affirmed, without costs.

. “REMIC” stands for “real estate mortgage investment conduit” (26 USC § 860D [a]).

. The complaint included several other claims of malpractice, all of which have been withdrawn or dismissed.

. The dissent incorrectly states that the majority agrees that Cadwalader advised Nomura that it could include, as REMIC real property, the “intangible interests inextricably linked to the real property.” Even Cadwalader on appeal does not argue that it provided that specific advice to Nomura, and the record contains no support for the dissent’s conclusion that such advice was given.

. Nomura’s underwriting guidelines required an LTV ratio of less than 80%. Since, to be REMIC qualified, a loan must have an LTV ratio of less than 125%, complying with the underwriting guidelines would often result in loans satisfying the REMIC 80% test. However, that is not true in all cases because the value of a property for underwriting purposes may not be the same as the value of the property for REMIC purposes.

. The dissent points to certain statements made by Nomura’s REMIC expert about “occupied” and “unoccupied” properties, and “intangible elements” of property value that are “inextricably linked” to the real property, to support its conclusion that there was nothing unusual, based on the information Cadwalader received, about the Doctors Hospital Loan. Although there is no dispute about what the expert said, we disagree that there was nothing unusual about this loan. The dissent fails to appreciate that the Deal Highlights document showed that Nomura’s appraised value may have included non-REMIC real property and contained an alternate valuation that brought it perilously close to the REMIC threshold. It is this information that sets the Doctors Hospital Loan apart from the other loans in the securitization.

. The dissent places undue emphasis on the extent to which the “Deal Highlights” document was mentioned by the parties at oral argument. In any event, there can be no dispute that the document was the subject of questioning by the bench. Moreover, given the inevitable time constraints, no conclusion can or should be drawn from what is covered in oral argument.

. Cadwalader unpersuasively argues that the due diligence claim should be dismissed on standing grounds because the Opinion Letter was not addressed to Nomura. The Opinion Letter was issued on behalf of Nomura, who was Cadwalader’s client at the time. Furthermore, Nomura alleges that it suffered injury as a result of the lack of Cadwalader’s due diligence before rendering the opinion.